IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA <br><br> v. <br><br> WILLIAM ZEV STEEN, <br><br> Defendant. | CRIMINAL NO.  SAG-23-102 |

**GOVERNMENT'S SENTENCING MEMORANDUM IN SUPPORT OF A SENTENCE OF 28 YEARS FOR DEFENDANT WILLIAM ZEV STEEN**

The United States of America respectfully recommends the Court sentence Defendant William Zev Steen to 28 years in prison and lifetime supervised release for his years long and repeated sexual exploitation of ▮▮▮▮▮▮▮▮.[1]  The defendant's sexual abuse of ▮ is troubling ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

The defendant sexually abused ▮ starting when she was just 2 years old and continued until she was 8 years old.  The abuse included genital to genital contact, as the defendant caused ▮ to be completely naked while sitting on the defendant's lap, while he was also naked.  The defendant abused ▮ in this way for 5 years, until she was 8 years old.  On at least two of these occasions in 2008 when ▮ was 5 years old, the defendant used a digital camera to produce videos of his sexual abuse of ▮ and saved the videos to an SD storage card.

In addition to his years of sexual abuse of ▮ the defendant's sexual attraction to prepubescent minors is demonstrated in his use of Peer-to-Peer file sharing to collect and share child pornography as recently as 2022, when he was arrested.  The files of child pornography collected and distributed by the defendant include hours of videos of prepubescent girls being

---

[1] The indictment and plea agreement identifies ▮ as Jane Doe.  For ease of understanding, this memo identifies the victim by her true name, and will be filed under seal.  A redacted version will be filed on the public record.

1

sexually abused, many of which are focused on father-daughter incest. At the time his residence was searched in November 2022, the files most recently played on the defendant's laptop included those same themes – hard core child pornography with prepubescent females engaged in incestual sexual conduct. Although the defendant was not then exploiting the children in his home, he continued to exploit other young girls by watching and distributing the memorialization of their abuse.

This case calls out for punishment and a significant sentence in order to protect society from the defendant, whose conduct demonstrates that he poses a clear and imminent threat to young girls. A 28-year sentence is also necessary as a just punishment for the defendant's conduct, to reflect the seriousness of the offense and to promote respect for the law.

As discussed in detail below, the applicable Sentencing Guidelines advise that this Court impose a sentence of 30 years' imprisonment. Consideration of the sentencing factors enumerated in Title 18, United States Code, Section 3553(a) also calls out for a significant prison sentence. The only just outcome is a substantial period of incarceration, reflecting the seriousness of the defendant's disturbing criminal offenses. To that end, the United States submits that 28 years' is sufficient to achieve the goals of punishment in this disturbing case.

I.   **FACTUAL BACKGROUND**

   A.   **The Stipulated Facts**

At the guilty plea hearing on December 6, 2023, the defendant admitted, under oath, that the following facts are true:

> William Zev Steen ("Steen"), age 45, is a resident of Baltimore, Maryland. As detailed below, between 2005 and 2011, Steen sexually abused ▇▇▇▇▇ ▇▇▇▇▇▇▇▇ who was between the ages of 2 and 8 at the time of the abuse. Steen produced images and videos of himself and [▇▇▇] engaged in sexually explicit conduct on at least two occasions in 2008. Additionally, in 2022, Steen collected and shared child pornography using a Peer-to-Peer file sharing network.

2

[████] was born in 2003. Starting at approximately age 2, Steen regularly sexually abused [████████████████████████████] Steen's abuse included causing [████] to be naked in a bed with Steen, who was also naked. Steen caused [████] to sit on top Steen, including genital to genital contact, until Steen ejaculated. Steen continued to abuse [████] in this way until [████] was at least 8 years old.

Steen used a Canon PowerShot A450 digital camera and other digital cameras to produce videos of the abuse. At some point before 2022 the videos were deleted, and the video files were broken into thousands of image files. The image files from two of those recordings were located on Steen's Kingston 2GB Micro SD card, S/N 0838K01707Y, a product of Japan, which was seized from his residence as indicated below.

Steen produced the following videos and images of his abuse of [████]

Group One:  Sexual Exploitation of [████] on or about November 26, 2008 (Count 1):

On November 26, 2008, Steen sexually abused [████] in a bedroom [████] [████████] The images of the abuse were located on the Kingston SD card and depict [████] and Steen, both fully naked, on a bed, with [████] sitting on top of Steen, straddling his torso. [████]'s anus and genitals are depicted, and Steen's penis is between [████]'s legs, in contact with [████]'s genitals. In some of the images Steen is holding his penis on [████]'s buttocks, and what appears to be ejaculate is on [████]'s buttocks. [████] was 5 years old.

Group Two, Attempted Sexual Exploitation of [████] on or about December 3, 2008 (Count 2):

On December 3, 2008, Steen sexually abused [████] in a bedroom [████] [████████] A partial video and images of the abuse were located on the Kingston SD card. The video is 1-2 seconds in duration, is in the same room as Count 1. The video depicts Steen naked, setting up the camera to record the bed. The images of the abuse from December 3, 2008 depict Steen with his genitals and buttocks exposed, sitting on the bed, as [████] is sitting on top of Steen, straddling his torso. Both Steen and [████] are naked. [████] was 5 years old.

Group Three:  Distribution of Child Pornography (Agreed Conduct):

In 2022, Steen used Peer-to-Peer (P2P) program on his computer to collect and share child pornography. In the summer and fall of 2022, a Baltimore City Police Department detective used a computer connected to the internet and launched a publicly available P2P file sharing program which identified that Steen had files containing child pornography available for download. The detective used the P2P program to download files depicting children engaged in sexually explicit

conduct directly from Steen's computer on numerous dates between July 2022 and October 2022, including, but not limited to, the following:

| Date | Description (selected files or file names) |
| --- | --- |
| July 11, 2022 | -A video file depicting a nude prepubescent female straddling a nude prepubescent male.  An adult hand enters the frame from outside of view and inserts the male's penis into the anus of a prepubescent female.<br><br>-A video file depicting a prepubescent female wearing a blue collar performing oral sex on an adult male. |
| July 22, 2022 | - A video file depicting a nude prepubescent female sitting on a toilet.  An adult male is masturbating and ejaculating onto the minor, who then licks ejaculate.<br><br>- A video file depicting a nude prepubescent female wearing a purple and gold mask in a bathtub.  The victim is spreading her legs and exposing her vagina.  A person off camera then urinates on the minor. |
| October 11, 2022 | The following files were downloaded (selected):<br><br>- St_Petersburg-I01 - Kimmy gives blowjob to man who cums on her face.avi<br>- 2boy1woman_09.avi<br>- Lisa-slip 8yr oral-nightshot.wmv<br>- ytkindsister_dog_and_pussy_18.05.2011.avi<br>- pthc new 2012 12yranska web.avi<br>- blond hot 12yo.mp4<br>- 14 yr old Sierra.avi<br>- (pthc) dad and cumming in toddler.avi |
| October 27, 2022 | The following files were downloaded (selected):<br><br>- (pthc) my best friend fucks my daughter 13yr for- 300 dollars, i films everything as a souvenier.wmv<br>- 13yo fucked.mp4 |

On November 3, 2022, a search warrant was executed at Steen's residence in Baltimore City.  During the search, investigators seized Steen's laptop and SD card, both of which contained depictions of child pornography, and are further described as:

    a.    Kingston 2GB Micro SD card, S/N 0838K01707Y, a product of Japan; and

    b.    Apple MacBook, Model A1990, S/N C02Z7D4YLVCF, a product of China.

The laptop was running the P2P program at the time it was seized. An examination of Steen's laptop revealed multiple link files indicative of child pornography (file names associated with having been played in the VLC video player), including the following:

- PTHC_2011 trailer-buratino (great).avi
- Pthc new 2014-TAMARA 10yo_WMV V9.mp4
- Pthc (Jack H'Off) Masked Girl Rides Again 2.mpg
- Sister 10y with brother webcam.avi
- PTHC – 8 yr naughty.wmv
- brother-fucks 8yr sister.avi

Four files depicting child pornography were located on the laptop, one of which depicts a minor female with blond hair with her mouth open around the erect penis of an adult male.

The defendant agrees that all of the images and videos described above were produced using materials that have been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer.

## II.     GUIDELINE CALCULATION

### A.  Statutory Maximum Sentence

The statutory maximum penalty for sexual exploitation of a child is 30 years' imprisonment. The Court may impose a term of supervised release of not less than five years to life, pursuant to 18 U.S.C. § 3583(k).

### B.  Sentencing Guidelines Calculation

The Probation Office has calculated that the total offense level, after acceptance of responsibility, is 43. PSR ¶ 46.[2] The government agrees with this calculation and asks that the court adopt the PSR's guidelines calculation at the time of sentencing.

#### i.  Criminal History Category & Guideline Sentence

The PSR accurately notes that 5 levels are added under U.S.S.G. § 4B1.5(b)(1). PSR ¶ 49.

---

[2] Although the total adjusted offense level results in a score of 46, this case presents one of those "rare" instances where the total offense level is calculated in excess of 43, thus the offense level is treated as a level 43. See Chapter 5, Part A (comment n.2).

5

This is consistent with the plea agreement.  ECF 35, at 7 (¶ 9).  Because § 4B1.5*(b)(1)* is the operative subsection, (and not § 4B1.5*(a)*), under subsection (b)(2), the criminal history is determined under Chapter Four.  Based on ¶ 50-51 of the PSR, the defendant has zero criminal history points and is therefore a criminal history category of I.  Thus, ¶52 which applies § 4B1.5*(a)* and states that the defendant is a criminal history category of V is in error and should be removed from the PSR.  Because the total offense level, after acceptance of responsibility is 43, the criminal history calculation has no impact on the guideline range in this case.  An Adjusted Base Offense Level of 43 and any criminal history yields a guideline range of life imprisonment.  Since the maximum sentence is 30 years, the guideline range is 30 years, or 360 months.  PSR ¶ 74.

**III.   18 U.S.C. § 3553(a) FACTORS DEMONSTRATE THAT THE DEFENDANT SHOULD BE SENTENCED TO 28 YEARS' IMPRISONMENT**

The nature and circumstances of the defendant's crimes are truly disturbing, and strongly weigh in favor of a very lengthy sentence.  The defendant sexually abused and exploited ▮▮▮ ▮▮▮ *over a period of five years* – not during one or two impetuous moments.  Thus, the defendant's conduct was not an aberration and was not isolated.

This Court's sentence must consider the need to "promote respect for the law." 18 U.S.C. § 3353(a)(2)(A).  When Congress passed the Protection of Children against Sexual Exploitation Act of 1977, it sought to address the organized, nationwide child pornography industry that was generating millions of dollars through the exploitation of children. S. REP. 95-438, 5, 1978 U.S.C.C.A.N. 40, 42-43.  The Act, which included 18 U.S.C. § 2251, was aimed at filling a void in federal law by targeting the production of materials depicting child abuse. S. REP. 95-438, 5, 1978 U.S.C.C.A.N. at 56.  But the Act, and its later amendments, are more than prophylactic measures.  They reflect value judgments and accepted moral norms of our society.  As one Senate Judiciary Committee report concluded: "the use of children…as the subjects of pornographic

6

materials is very harmful to both the children and the society as a whole," describing the conduct as "outrageous." S. REP. 95-438, 5, 1978 U.S.C.C.A.N. at 43.  There can be no question that the defendant's conduct, both in its shocking character and in its frequency, are among the most serious under the law.  The seriousness of the defendant's conduct necessitates that he be sentenced to a significant prison term, in order to promote respect for the law and to provide a just punishment.

The sentence imposed must also afford adequate deterrence to criminal conduct of this nature, and protect the public from further crimes of by the defendant.  The facts in this case reflect the danger that the defendant poses to the public.  The defendant's conduct over a period of 5 years ███████████████████████████████████████████████████████████ A significant sentence and lengthy term of supervised release will act as a deterrent and will specifically deter this defendant from committing additional crimes against minors while he is incarcerated and on supervised release.

███████████████████████████████████████ Imposing a significant sentence will act as a deterrent, not just to the defendant, but to other individuals in the general community.  A 28-year sentence will send a strong message to the community, that those who sexually abuse and produce sexually explicit and abusive images of children will be held accountable for their crimes and will receive very significant punishment.  There must be a message that there is no excuse or mitigation for the sexual exploitation ████████████

## IV.   VICTIM IMPACT

### A.   The Harm Caused to ▮ and Her Family

The impact on ▮ in this case is unquestionable. In addition to living with the aftermath of sexual abuse, ▮ (and her family) will also live forever with the knowledge that her pain and humiliation was captured on video.

To be sexually abused as a child is devastating: the effects are long term and prolific, affecting every aspect of the child's life for years to come. Unfortunately, while often thought of as resilient, children rarely fully recover from the trauma of sexual abuse. *See* A. Perry and D. DiLillo, *Child Sexual Abuse,* 147, in N.A. Jackson, Encyclopedia of Domestic Violence, (2007). Sexual trauma can actually affect the neurobiology of children, and such young victims of sexual abuse have more problems with anxiety, high-strung temperament, speech and language delay, inattentiveness and hyperactivity, and are at higher risk for mood disorders. *Id.* While short-term effects of sexual abuse include fear, anxiety, anger, depression, and sexually inappropriate behavior, long-term effects include self-destructive behavior, tendency toward revictimization, substance abuse, and sexual maladjustment. The type of sexual abuse that inflicts the most damage on victims is found in cases like this one, which includes ▮ genital contact. *See* A. Browne and D. Finklehor, *Impact of Child Sexual Abuse: A Review of the Research,* 60, in B. Finkleman, Child Abuse: Short and Long-Term Effects (1995). In the *Child Pornography Prevention Act of 1996* ("CPPA"), Congress recognized that the production of child pornography "is a form of sexual abuse which can result in physical or psychological harm, or both, to the children involved" since it creates a permanent record of the child's abuse, allowing for continued victimization of that child. S. Rep. 104-358 § 2 (1)(2) (1996).

Many studies have documented the long-term effects related to sexual abuse and rape in

children, including psychological, physical, and emotional damage.  Below are detailed the results of just a few such studies:

- P. Cohen, J. Brown, & E. Smailes, *Child abuse and neglect and the development of mental disorders in the general population*, 13 Development and Psychopathology 981-99 (2001).

    o   In this study, those sexually abused as children had a higher rate of anxiety, disruptive behaviors, substance abuse, and cluster A (schizoid, schizotypal, and paranoid) and cluster B (histrionic, narcissistic, and borderline) personality disorders compared to those who experienced physical abuse and neglect as children.

- B.E. Molnar, L.F. Berkman & S.L. Buka, *Psychopathology, childhood sexual abuse and other childhood adversities: Relative links to subsequent suicidal behaviour in the US*, 31 Psychological Medicine 956-77 (2001).

    o   "In the US, a strong association exists between child sexual abuse and suicidal behavior, mediated by psychopathology. […] From a clinical standpoint, abuse survivors represent a high-risk population for suicidal behavior." (abstract, p.965)

    o   "The prevalence of suicidal behaviours among those who experienced child sexual abuse was significantly higher than the prevalence among those not reporting child sexual abuse […] The prevalence was highest among those who reported child rape.  Among women, 27% of those reporting child rape had attempted suicide compared with 5% who did not report child rape. Similarly, among men reporting child rape, 31% reported suicide attempts, compared with 3%." (p. 969)

- E.O. Paolucci, M. L. Genuis, & C. Violato, *A meta-analysis of the published research on the effects of child sexual abuse*, 135(1) The Journal of Psychology 17-36 (2001).

    o   "Numerous empirical studies investigating the developmental impact of sexual abuse on children and adolescents indicate that many symptoms of maladjustment and maladaptation are associated with the experience of sexual abuse.  Most frequently reported are problems of depression, anxiety, and other internalizing disorders, as well as externalizing problems such as dissociation, conduct disorders, aggressiveness, and inappropriate or early sexual behavior and activity." (p. 19)

    o   "Sexual maladjustment, interpersonal problems, educational difficulties, acute anxiety neuroses, self-destructive acts, somatic symptoms, loss of self-esteem, prostitution and delinquent criminal behavior, depression, and actual or attempted suicide are some of the difficulties reported by child sexual abuse victims." (p. 19)

9

These studies reflect the tip of the iceberg as to the damage caused when the innocence of a child is stolen through sexual assaults like those perpetrated by Thompson.

Though the Supreme Court in *Kennedy v. Louisiana*, 554 U.S. 407, 435 (2008), held that the death penalty could not constitutionally be imposed for the rape of a child, the majority acknowledged the significant harm that sexual abuse of a child inflicts on a victim:

> Here the victim's fright, the sense of betrayal, and the nature of her injuries caused more prolonged physical and mental suffering than, say, a sudden killing by an unseen assassin. The attack was not just on her but on her childhood. For this reason, we should be most reluctant to rely upon the language of the plurality in *Coker*, which posited that, for the victim of rape, "life may not be nearly so happy as it was." 433 U.S., at 598, 97 S.Ct. 2861. Rape has a permanent psychological, emotional, and sometimes physical impact on the child. *See* C. Bagley & K. King, *Child Sexual Abuse: The Search for Healing* 2–24, 111–112 (1990); Finkelhor & Browne, Assessing the Long–Term Impact of Child Sexual Abuse: A Review and Conceptualization, in Handbook on Sexual Abuse of Children 55–60 (L. Walker ed. 1988). We cannot dismiss the years of long anguish that must be endured by the victim of child rape.

*Id*. at 435. The Fourth Circuit agreed with the Supreme Court about the "psychological, emotional, and mental health, of children, and that preventing the sexual exploitation of this uniquely vulnerable group 'constitutes a government objective of surpassing importance.'" *United States v. Cobler,* 748 F.3d 570, 580 (4th Cir. 2014) *quoting New York v. Ferber*, 458 U.S. 747, 757-58 (1982). The Court in *Cobler* also noted the acts of molestation and production of child pornography were "heinous acts that exploited, injured, and inflicted great harm on a most vulnerable victim." *Id.*

Child exploitation offenses are horrible crimes, which cause real and lasting harm to the victims. Child pornography is "intrinsically related to the sexual abuse of children," because it is "a permanent record of the children's participation," and "the harm to the child is exacerbated" by its circulation. *United States v. Blinkinsop*, 606 F.3d 1110, 1117-18 (9th Cir. 2010), *cert. denied,*

10

132 S. Ct. 1055 (2012) (internal quotation marks and citations omitted).  The sexual abuse of children "is a most serious crime and an act repugnant to the moral instincts of a decent people." *Id.* at 1118 (internal quotation marks and citation omitted).  The children depicted in the images and videos "additionally endure ongoing harm because their images have been preserved in a permanent medium." *Id.* (internal quotation marks, citation, and footnote omitted).  As one district judge cogently noted, while most, if not everyone, agree that child exploitation is heinous, oftentimes during the processing of these cases through the criminal justice system, there is a tendency to sanitize the subject matter, resulting in a less fulsome appreciation for the real-life, long-term consequences of these crimes:

> Child pornography is a vile, heinous crime.  Mention the term to your average American and he responds with immediate disgust and a sense of unease.  However, once it enters the legal system, child pornography undergoes sterilization.  The sterilization goes far beyond properly removing emotion from sentencing decisions.  Images are described in the most clinical sense.  Victims all too often remain nameless.  The only emotions on display are those of defendants, sorry that their actions were discovered by law enforcement.

*United States v. Cunningham*, 680 F. Supp. 2d 844, 847 (N.D. Ohio 2010), *affirmed* 669 F.3d 723 (6th Cir.), *cert. denied,* 133 S.Ct. 366 (2012).  That is precisely the case with this defendant.

 was very young ▆▆▆▆▆▆▆▆▆▆▆▆   But not *that* young.  The abuse started when she was 2 years old, and continued until she was 8 years old.  It is unclear how deeply the trauma is sewn.  No one knows for sure when, where, or how the damage from the defendant's ▆▆▆▆ sexual abuse will manifest itself as ▆▆ grows older.

The defendant in this case stole more than the innocence of ▆▆▆  He also stole ▆▆▆ security by sexually abusing and exploiting her at such a young age.  The true impact of his actions on ▆▆ is incalculable.  ▆▆ and the defendant's family have requested leniency, and this Court can properly consider those requests and give them the weight they deserve.  But those letters and

11

requests do not lessen in any way the impact that the defendant's conduct has caused, whether or not articulated by her family.

### B.      The Defendant Caused Harm to Other Victims of Sexual Abuse

It is beyond dispute that the defendant's trafficking of child pornography further victimizes the abused children depicted in the child pornography and increases the demand for these offensive and criminal materials.

<u>Federal Courts Recognize that Trafficking in Child Pornography Harms Victims</u>

The federal courts have long recognized the debilitating and continuing harms to children whose sexual abuse is displayed in widely disseminated child pornography. "As a general matter, the prohibition of child pornography derives from a legislative judgment that such materials are harmful to the physiological, emotional, and mental health of children, and that preventing the sexual exploitation of this uniquely vulnerable group 'constitutes a government objective of surpassing importance.'" *United States v. Cobler*, 748 F.3d 570, 580 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 229 (2014) (quoting *New York v. Ferber*, 458 U.S. 747, 757–58 (1982)).

Because the material creates "a permanent record" of the abuse, the damage to child victims extends far beyond the abuse depicted and is "exacerbated by . . . circulation [of the material]." *Ferber*, 458 U.S. at 759. Distribution of the material not only prolongs the damage to the children depicted but also generates demand and drives the production of new material, which imposes the same continuing injuries to new child victims. As early as 1982, the Supreme Court observed the "serious national problem" presented by child pornography, *id.* at 749, and the problem has surged exponentially with the increasing ease with which the material has been trafficked through use of the Internet, *see Paroline v. United States*, 134 S. Ct. 1710, 1717 (2014).

<u>The Defendant's Conduct Encourages Additional Exploitation of Children</u>

Further, the defendant's sharing of child pornography on a Peer-to-Peer network with like-minded individuals serves both to "normalize" deviant behavior and encourage additional abuse of children.  As reported by the 2012 Sentencing Commission's Report to Congress,[3] many child pornography offenders use websites, chat rooms, and other interactive technologies dedicated to child pornography that allow direct communication with "like-minded peers."  Such online communities, concluded the Commission, "'validate [offenders'] behavior" and 'provide encouragement' to continue offending."  U.S. Sentencing Comm'n Report, 92-93.  These communities cause the participants to develop distorted attitudes towards children and increase the likelihood that other community members may engage in sex offending to create new child pornography images for trading online.  *Id*.  The Commission concluded:

> Child pornography communities make viewing of sexualized images of children acceptable and implicitly or explicitly condone sexual offenses against children. Child pornography communities can be social and supportive environments and can foster relationships among offenders. These relationships appear to support development of deviant sexual beliefs concerning children and validate and normalize child sexual exploitation.

*Id*., Chapter 4, p. 105; *see also Paroline v. United States*, 134 S. Ct. 1710, 1741 (2014) ("by communally browsing and downloading Internet child pornography, offenders like Paroline "fuel the process" that allows the industry to flourish. O'Connell, Pedophiles Networking on the Internet, in Child Abuse on the Internet: Ending the Silence 77 (C. Arnaldo ed. 2001).  Indeed, one expert describes Internet child pornography networks as "an example of a complex criminal conspiracy," ibid.—the quintessential concerted action to which joint and several liability attaches.").  This defendant too has "fueled the process" and contributed to the "industry" of child

---

[3] U.S. Sentencing Comm'n, Federal Child Pornography Offenses xvii (2012), available at http://www.ussc. gov/sites/default/files/pdf/news/congressional–testimony–and-reports/sex–offense–topics/201212–federal– childpornography–offenses/Full_Report_to_ Congress.pdf.

13

rape and sexual abuse. He has contributed to, and extended, the "permanent record" of their sexual abuse. As reflected in the defendant's sentencing submission, the defendant volunteered/worked at TAG International (https://tag.org/) a technology company that assists the orthodox Jewish community with installing filters on digital devices to prevent access to inappropriate materials. So while the defendant appears to have attempted to help his community avoid pornography, he was simultaneously contributing to the exploitation of minors elsewhere.

The government asks the Court to take all the harm caused by the defendant's conduct into consideration when determining the appropriate sentence.

## V. THE DEFENDANT'S SENTENCING SUBMISSION & EXHIBITS

The defendant submitted multiple letters of support from his family and members of the community. The defendant also submitted a video compilation of some of his family and two Rabbis, all providing statements in support of the defendant and appealing for a lenient sentence. The government addresses some of these statements here. It is of course unclear from these statements whether all of these individuals are aware of the full scope of the defendant's criminal conduct here.

### A. References to Therapists

At approximately 6:20 on the video, the defendant's wife, Rebecca "Rivky" Steen, describes her decision to remain with the defendant following her learning that he had been sexually abusing ▓▓▓ Mrs. Steen states that a "therapist assessed the situation and thought that it was safe to stay…" At 7:04 on the video, Rabbi Shraga Neuberger (described on the video as "Zev & Rivky's mentor and advisor") recounts that after the defendant and his wife came to him in 2013 and disclosed the defendant's conduct, Rabbi Neuberger "sent them, her and him, to a counselor who had experience in this area." Rabbi Neuberger then described how he supported

Mrs. Steen's decision to remain in the marriage.

These statements from Mrs. Steen and Rabbi Neuberger give the impression that a licensed therapist specializing in the sexual abuse of children performed some kind of assessment after having been provided with full information and then certified that the defendant was not a danger to children. Not so. Upon learning of the exploitation, Rabbi Neuberger referred the defendant and Mrs. Steen to Yehuda Bergman, an expressive and drama arts therapist. Mr. Bergman graduated from the expressive therapies program at Lesley University, where he majored in Psychodrama and Drama Therapy. Mr. Bergman holds no licenses, although he is a registered drama therapist. Mr. Bergman does not specialize in sexual abuse or sex trauma and does not treat minors.

In May 2023, Mr. Bergman provided records and gave testimony before a federal grand jury pursuant to grand jury subpoena and a court order authorizing disclosure of the documents and testimony. Mr. Bergman testified that he began therapy with the defendant and Mrs. Steen immediately after the couple went to Rabbi Neuberger in June 2013 and that the therapy continued for just over a year. The defendant admitted to Mr. Bergman that he sexually abused ▮ over a period of years and stated that the abuse last occurred "a little bit earlier." Notably, although Mr. Bergman was aware of his duty to report child sex abuse to authorities, he testified that he and Rabbi Neuberger decided *not* to report the abuse to authorities, explaining that the consequences would be too difficult for ▮

▮ following the disclosure of the abuse, ▮ saw a therapist for about a year, which included art therapy. ▮ the therapist stated that there were "no sexual indications at all," and counseling was terminated.

During the federal investigation into the defendant's conduct, investigators spoke to Laura

15

Greer, LCSW. Ms. Greer provided counseling services to ▓ starting in October 2013. ▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ms. Greer stated that she was informed generally that there had been some kind of sexual abuse and was given no further information about the abuse.

Additionally, Ms. Greer stated that neither ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ever described to her the nature or extent of the defendant's sexual abuse of ▓ During Ms. Greer's treatment of ▓▓▓▓ never disclosed the sexual abuse, and Ms. Greer did not ask. The counseling ended in August 2015. To the government's knowledge, ▓ has never disclosed ▓▓▓▓▓▓ sexual abuse of her to any person and has also never received counseling to address the abuse and its unquestionable impact.

B. **Pleas for Leniency**

The video also includes pleas for a lenient sentence from multiple members of the defendant's family, as well as from Rabbi Neuberger and Rabbi Mordecai Shuchatowitz.

At 15:33 in the video, Rabbi Shuchatowitz (described in the video as "Leader of Baltimore Rabbinical Court & advisor to Zev") implies that the defendant's "addiction" (referring to his interest in child pornography), is "because of something unhappy in [his] life." Rabbi Shuchatowitz opines that the defendant did not produce, collect, and distribute child pornography because he wanted to see "inappropriate material." Instead, he claims that the defendant did so because something was "gnawing" at or "bothering" the defendant.

Contrary to Rabbi Shuchatowitz's uninformed justification, the simple truth is that the defendant is sexually attracted to minors and has significant impulse control over his deviant sexual urges. The Rabbi admits as much when he later explains, at 16:00, that the defendant admitted to him that he "struggled with a problem" that he had not overcome, and that he had

slipped "back into certain things." Rabbi Shuchatowitz goes on to say that the defendant is a "very good person," and he hopes that he will be given the chance to be with his family in the community.

Similarly, at 22:16 in the video, Rabbi Neuberger opines:

> [H]aving [the defendant] separated from his family for a long time is a death sentence to the emotional health of this family, which is a family and can continue as a family the sooner he could be in a state of being protected not to hurt anybody else. Which I think is possible.

\*\*\*

> They've already gone through hell through all of this. Whatever considerations can be given with balance, I think, is well worth considering.

The criminal actions of defendants often cause significant collateral trauma, and there is no doubt that the defendant's crimes–his repeated abuse of ▮ over years and his trafficking in videos depicting the rape of children–have caused collateral damage. The defendant bears the full responsibility for that damage.

The Fourth Circuit and other circuit courts have often found that family circumstances comparable to those of the defendant, or arguably even more severe, are not "extraordinary" and therefore did not merit a sentencing reduction. *See generally United States v. Hampton*, 441 F.3d 284 (4th Cir. 2006) (vacating sentence where downward departure was based on concern for defendant's children); *United States v. Brand*, 907 F.2d 31 (4th Cir. 1990) (fact that defendant was sole custodial parent and that her incarceration would result in separation of her 2 children and their placement with blood strangers was not extraordinary and did not justify downward departure sentence of probation for defendant convicted of distributing 2 grams of cocaine.); *United States v. Gonzalez*, 251 F. App'x 58 (2d Cir. 2007) (unpublished) (fact that defendant, who was sentenced to life imprisonment based on conviction of conspiring to distribute more than 50 grams of cocaine base, was father to six children did not warrant sentence departure under USSG § 5H1.6.); *United*

17

*States v. Mendez*, 272 F. App'x 703 (10th Cir. 2008) (unpublished) (district court did not clearly err when it refused to grant defendant departure based on his breadwinner status under USSG § 5H1.6 because nothing in record indicated impact on defendant's family was substantially greater than impact incarceration would have imposed on other similarly situated families); *United States v. Ayala-Garcia*, 276 F. App'x 750 (10th Cir. 2008) (unpublished) (defendant's sentence was not substantively unreasonable where because defendant's sentence would have burdened his family, his situation, tragically enough, was all too ordinary, and appellate court deferred to district court's conclusion that defendant's special circumstances were not special enough that they required sentence under USSG § 5H.1.6 lower than that provided by guidelines).

In *Hampton*, the Fourth Circuit vacated the defendant's sentence where the downward departure was based on concern for the defendant's children. It explained that:

> Family ties and responsibilities are a discouraged factor under the guidelines. U.S.S.G. § 5H1.6. Under the facts of this case, Hampton would not have been entitled to a downward departure pursuant to a computation of an appropriate sentence under the guidelines, and we do not find in this record, considering all the circumstances, any other basis for a reduction of near this magnitude.

441 F.3d at 289; *see also Motz, J.*, concurring (further adding that "the court's purported reasons for reducing Hampton's sentence fall far short of justifying a variance of such a degree.").

As the District of Columbia Circuit stated in *United States v. Dyce*, 91 F.3d 1462, 1468 (D.C. Cir. 1996), which was cited with approval by the Fourth Circuit in *United States v. Wilson*, 114 F.3d 429, 434 (4th Cir. 1997), "The unfortunate fact is that some [parents] are criminals; and like it or not, incarceration is our criminal justice system's principal method of punishment."

## VI.   CONCLUSION

For all of these reasons, the government respectfully asks this Court to sentence the defendant to 28 years' imprisonment, followed by lifetime supervised release with all

recommended conditions sought by U.S. Probation.  The Court must also inform the defendant of his statutory responsibility to register as a sex offender, impose a $100.00 special assessment, and enter a final order of forfeiture.

                                        Respectfully submitted,

                                        Erek L. Barron
                                        United States Attorney

By: _____
                                        Paul E. Budlow
                                        Michael Aubin
                                        Assistant United States Attorneys